# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

MARSHA M. HARRIS,

       Plaintiff,

v.                               Civil Action 2:18-cv-288
                                   Judge George C. Smith
                                   Magistrate Judge Jolson

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Marsha M. Harris, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed her application for SSI and DIB on November 4, 2014, alleging that she was disabled beginning January 15, 2014. (Doc. 7, Tr. 221–228, PAGEID #: 264–71). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held the hearing on March 16, 2017. (Tr. 42–77, PAGEID #: 82–117). On August 14, 2017, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 12–38, PAGEID #: 52–78). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3, PAGEID #: 41–43).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on April 3, 2018. (Doc. 1). Plaintiff filed her Statement of Errors (Doc. 10) on September 7, 2018.

Defendant filed an Opposition (Doc. 11) on October 22, 2018, and Plaintiff filed her Reply (Doc. 12) on November 5, 2018. Thus, this matter is now ripe for consideration.

      **A.     Relevant Hearing Testimony**

Plaintiff was 47 years old at the time of the hearing. (Tr. 47, PAGEID #: 87). She stated that she lives alone in a two-story apartment. (Tr. 48, PAGEID #: 88). Plaintiff testified that she does not have a driver's license because she is "paranoid about driving." (Tr. 49, PAGEID #: 89). She reported that she travels by bus or has friends drive her. (Tr. 49–50, PAGEID #: 89–90).

Plaintiff also testified as to her educational background. (Tr. 50, PAGEID #: 90). She indicated that she graduated high school but that she had been in a special education program. (*Id.*). According to her, she can read and write "some." (*Id.*).

With respect to her work history, Plaintiff testified that she has not worked since the onset date of her alleged disability. (*Id.*). Prior to the onset date, she stated that she had worked for Zandex Healthcare from 2008 to 2014 as a server and cook in a nursing home and rehabilitation facility. (Tr. 50–51, PAGEID #: 90–91). She worked as a server for four years and then as a cook for the remainder of her time there. (Tr. 51–52, PAGEID #: 91–92). As a cook, she generally worked alone cooking or preparing microwaved meals. (Tr. 52, PAGEID #: 92). Plaintiff testified that she worked a series of short-term jobs prior to her work at Zandex, none of which constituted substantial gainful activity. (Tr. 53–55, PAGEID #: 93–95).

Plaintiff told the ALJ that she is unable to do even a sit-down job because of her back pain. (Tr. 55, PAGEID #: 95). She reported that she recently had back surgery to address the severe pain she experiences. (Tr. 55–56, PAGEID #: 95–96). Plaintiff further testified that she had nerve decompression surgery on her left leg. (Tr. 57, PAGEID #: 97). Plaintiff stated that, prior to the surgery, she was unable to cook or clean because of the severe pain in her left leg. (*Id.*). She testified that she could not stand for more than five minutes at a time. (*Id.*). She

indicated that she had not seen much benefit from the back surgery. (Tr. 58, PAGEID #: 98). Plaintiff further testified that she has headaches and has been diagnosed with COPD. (Tr. 60–62, PAGEID #: 100–02).

Plaintiff then addressed her mental health. (Tr. 63, PAGEID #: 103). She testified that she has been feeling "more stressed" because she cannot do anything. (*Id.*). Plaintiff reported that she is not in therapy and is not taking any medication for her mental health issues. (*Id.*). According to her, she had previously taken medication for her mental health issues, but they put her in "a zombie mood" and made her feel "more depressed." (*Id.*).

Turning to her activities of daily living, Plaintiff reported that she lives independently in her apartment, but requires help from others. (Tr. 64, PAGEID #: 104). According to her, she spends most days in bed, and her ex comes over to cook, do the dishes, and take out the trash. (Tr. 64–65, PAGEID #: 104–05). However, Plaintiff reported being able to shop on her own. (Tr. 64, PAGEID #: 104). She testified that she does not have a social life because she does not "feel the interest in it." (Tr. 66, PAGEID #: 106).

Vocational Expert Dr. John Finch (the "VE") testified as an impartial witness. (Tr. 71–75, PAGEID #: 111–15). The ALJ asked the VE a series of hypotheticals:

> I'd like you to initially consider a hypothetical individual who can perform a range of light work as that's defined in our regulations in the DOT. This individual can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, can occasionally push, pull, or operate foot controls with the left lower extremity can never climb ladders, ropes, or scaffolds, cannot work around hazards such as unprotected heights or exposure to moving mechanical parts, cannot work in atmospheric conditions, temperature extremes, or humidity. This individual can perform simple routine tasks at an average pace, but cannot perform jobs with strict time or product demands, can interact occasionally with coworkers and supervisors, but work tasks should be capable of being performed independently without teamwork or tandem work and should not require any interactions with the public. This individual can adapt to occasional changes in work duties that are explained. Can this hypothetical individual do the past work?

(Tr. 72–73, PAGEID #: 112–13). The VE opined that the hypothetical individual could not perform any past work but that individual could work as a mail clerk, hand packager, or garment

folder. (Tr. 73, PAGEID #: 113).

Continuing, the ALJ followed-up with a revised hypothetical:

I'd like you to consider generally the same non-exertionals, except with these changes. Exertionally this individual is limited to the sedentary range of work as that's defined in our program. In addition this individual can stand, walk, or climb ramps and stairs for only ten minutes at one time up to two hours in a workday. Otherwise the non-exertionals remain the same. Can this hypothetical individual do the past work?

(Tr. 73–74, PAGEID #: 113–14). The VE opined that the hypothetical individual could not perform any past work, but that individual could work as a sorter, inspector, or machine tender. (Tr. 74, PAGEID #: 114).

The ALJ placed additional limitations on the hypothetical individual, asking the VE, "If the hypothetical individual were off-task 15% of the workday due to their pain or other symptoms, would there be any competitive unskilled work available?" (*Id.*). The VE found that no competitive unskilled work would be available to an individual with these restrictions. (*Id.*). Further, the VE concluded that no competitive work would be available for the hypothetical individual if they were absent two days a month on a consistent basis. (*Id.*).

### B. Relevant Medical Background

Plaintiff's arguments concern her mental impairments only, and the Court thus examines the relevant medical evidence pertaining to the same.

#### 1. *Treatment Notes*

On January 30, 2013, Plaintiff completed a mental health assessment at Six County, Inc. ("Six County"). (Tr. 410–17, PAGEID #: 455–62). Plaintiff reported feeling stressed and overwhelmed. (*Id.*). On a scale of 1-10, she rated the severity of her stress as a ten. (*Id.*). Plaintiff's mental health history indicated that she had previously been treated for depression by her family doctor and Six County. (Tr. 412, PAGEID #: 457). Plaintiff stated that she did not

4

feel depressed. (*Id.*). Further, she reported no history of hospitalization for psychiatric issues. (*Id.*).

In conducting Plaintiff's mental status exam, staff at Six County observed that Plaintiff's appearance, affect and mood, and intellectual functioning were "not remarkable." (Tr. 413, PAGEID #: 458). Although they found that Plaintiff's insight into her behavioral health issues was limited, they noted that her judgment and memory were not impaired. (Tr. 413–14, PAGEID #: 458–59). Staff diagnosed Plaintiff with Generalized Anxiety Disorder and Personality Disorder NOS and recommended medication evaluation and management, among other services. (Tr. 416–17, PAGEID #: 461–62).

After her initial mental health assessment at Six County, Plaintiff returned twice for medication management services. (Tr. 418–25, PAGEID #: 463–70). At both visits, Plaintiff reported that she was experiencing significant stress and anxiety. (*Id.*). In February 2013, Bethany Reiner, CNP, prescribed Trazodone and Cymbalta to address Plaintiff's anxiety and insomnia. (Tr. 420–21, PAGEID #: 465–66). At her next appointment in March 2013, Plaintiff reported that she stopped taking her medications because of their side effects and because they were ineffective. (Tr. 422–23, PAGEID #: 467–68). On December 4, 2013, Six County terminated Plaintiff from its medication management program for unexplained reasons, noting that Plaintiff had not improved. (Tr. 426–29, PAGEID #: 471–74).

Plaintiff apparently reinitiated mental health treatment at Six County in 2015. (*See* Tr. 774–82, PAGEID #: 820–28; Tr. 825–44, PAGEID #: 871–90). Those treatment notes reflected a new round of treatment for Plaintiff's anxiety and stress. (*See id.*).

  2. *SSA Psychological Evaluation*

On December 17, 2017, Steven Meyer, Ph.D. conducted a psychological evaluation

5

relating to Plaintiff's claim for mental disability benefits. (Tr. 599–605, PAGEID #: 644–50). Plaintiff reported that she had attended outpatient counseling many years ago and had never been administered psychological testing. (Tr. 600, PAGEID #: 645). She further indicated that she had never attempted suicide or had a nervous breakdown. (*Id.*). Although she had previously been prescribed psychotropic medication, Plaintiff reported that it had not been effective. (*Id.*).

With respect to her activities of daily living, Plaintiff reported that she had coffee and watched television for most of the day. (Tr. 601, PAGEID #: 646). She stated that she was able to clean, cook, and shop as needed. (*Id.*). Plaintiff reported visiting with her mom and children every day. (*Id.*). Outside of family, Plaintiff indicated she did not have a social life. (*Id.*). She represented that she had never had a driver's license. (*Id.*).

Dr. Meyer noted that Plaintiff's appearance was clean, but unkempt. (*Id.*). He observed that she was "a little down and mildly jumpy and impulsive," but that her eye contact, tone, and expressiveness were normal. (*Id.*). Describing her affect and mood, Dr. Meyer indicated that her "affect was reactive and her prevailing mood was mildly dysphoric, anxious, and irritable." (*Id.*). Plaintiff reported being depressed and anxious sometimes as a result of her physical impairments and their impact on her quality of life. (*Id.*).

Dr. Meyer found that Plaintiff was "alert, clear, and oriented to person, place, time, and situation," but that "[h]er short-term memory abilities were below average." (*Id.*). He further concluded that Plaintiff "showed limited insight into her psychological problems and need for treatment." (Tr. 602, PAGEID #: 647). Plaintiff stated that she was not able to live independently because of her physical impairments. (*Id.*). In an evaluation of her intellectual abilities, Plaintiff scored a full scale IQ of 63, which placed "her in the mentally deficient range of intellectual functioning." (*Id.*). Dr. Meyer observed that, although Plaintiff's score "fell in the

6

mentally deficient range, . . . on presentation and given her history of functioning and her reported ADLs, she seems to be at least in the borderline range." (*Id.*). Further, he noted, Plaintiff's "scores may underestimate her abilities somewhat secondary to somatic concerns and discomfort, along with psychological distress." (*Id.*). Dr. Meyer ultimately diagnosed Plaintiff with Anxiety Disorder with Depression and Anxiety and Learning Disorder, by history. (*Id.*).

He then completed a functional assessment of Plaintiff. (Tr. 603, PAGEID #: 648). Dr. Meyer found that Plaintiff had the cognitive capacity to understand, remember, and carry out simple and moderately complex instructions and tasks with oral and hands on assistance and supervision as needed. (*Id.*). With respect to Plaintiff's abilities and limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple and multistep tasks, Dr. Meyer opined that Plaintiff "could perform in a setting without strict production requirements, and with assistance as needed at times of learning and performing new tasks." (*Id.*). However, Dr. Meyer further concluded that "[m]ultistep tasks, or tasks that increase her expectation of sustained performance or strict pace requirements would likely increase her psychological distress and somatic concerns." (*Id.*). Turning to Plaintiff's abilities and limitation in responding appropriately to supervision and coworkers in a work setting, Dr. Meyer noted that Plaintiff historically "has had problems getting along with people including supervisors." (*Id.*). He concluded that Plaintiff "is expected to be able to perform only in a non-public position, with at most intermittent/occasional contact with coworkers and supervisors." (*Id.*). Finally, Dr. Meyer addressed Plaintiff's abilities and limitation in responding appropriately to work pressures in a work setting. (*Id.*). He determined that she could meet the demand of a low stress setting only, for work with in any physical conditions, and with additional assistance available as needed at times of change in routine." (*Id.*).

### 3. *State Agency Psychological Consultants*

Bruce Douglass, Ph.D. completed a mental residual functional capacity assessment of Plaintiff. (Tr. 87–89, PAGEID #: 128–30). He found that Plaintiff was "[c]apable of simple and repetitive work tasks with 1–2 steps," "[c]apable of work that does not require strict time/production quotas," "[c]apable of work that is in non-public setting and requires only occasional and intermittent interactions," and "[c]apable of work in a static setting with few changes in routine." (*Id.*). In summary, Dr. Douglass opined that Plaintiff "retains the capacity to perform routine, 2-step tasks on a sustained basis." (Tr. 89, PAGEID #: 130).

On reconsideration, Karen Terry, Ph.D. completed a mental residual functional capacity assessment of Plaintiff. (Tr. 116–17, PAGEID #: 157–58). She found that Plaintiff was "[c]apable of simple and repetitive work tasks with 1–3 steps," "[c]apable of work that does not require strict time/production quotas," and "[c]apable of work that is in non-public setting and requires only occasional and intermittent interactions." (*Id.*). With respect to Plaintiff's adaption capacities and/or limitations, Dr. Terry found that Plaintiff retained:

> the ability to perform routine job duties that remain static and are performed in a very structured, stable, predictable work setting doesn't undergo frequent changes; any necessary changes need to occur infrequently and be adequately and easily explained to her ahead of time at any time requested when learning novel tasks.

(Tr. 117, PAGEID #: 158).

### C. The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since January 15, 2014, the alleged onset date. (Tr. 17, PAGEID #: 57). The ALJ determined that Plaintiff suffered from the following severe impairments: peripheral vascular disease; peripheral neuropathy; migraine headaches; chronic obstructive pulmonary disease; degenerative joint disease of the left knee; lumbar/thoracic scoliosis; degenerative disc disease of the lumbar and

8

cervical spine; depressive disorder; anxiety disorder; personality disorder; and learning disorder. (Tr. 17–18, PAGEID #: 57–58). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 18–21, PAGEID #: 58–61).

Relevant here, the ALJ concluded that Plaintiff's mental symptomatology did not result in at least two limitations or one extreme limitation in the areas of activities of daily living, social functioning, concentration/persistence/pace, or episodes of decompensation as required in "paragraph B" in 12.00 of the Listing of Impairments. (Tr. 19–21, PAGEID #: 59–61). Rather, the ALJ found Plaintiff had moderate limitations in her ability to understand, remember, or apply information; moderate difficulties interacting with others; moderate limitations with regard to concentrating, persisting, or maintaining pace; and moderate limitations in her ability to adapt or manage herself. (Tr. 19–20, PAGEID #: 59–60). Thus, the ALJ held that Plaintiff did not satisfy the "paragraph B" criteria. (Tr. 20, PAGEID #: 60). Similarly, the ALJ concluded that Plaintiff did not satisfy the "paragraph C" criteria or "paragraph A" criteria of listing 12.05. (Tr. 20–21, PAGEID #: 60–61).

The ALJ then reviewed the relevant medical evidence, (Tr. 21–28, PAGEID #: 61–68), and addressed Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . except: she can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; she can occasionally push and pull and use foot controls with the left lower extremity; she can never climb ladders, ropes, and scaffolds; she cannot work around hazards such as unprotected heights or exposure to moving mechanical parts; she cannot work in atmospheric conditions, temperature extremes, or humidity; she can perform simple routine tasks at an average pace but cannot perform jobs with strict time or production demands; she can interact occasionally with coworkers and supervisors but work tasks should be capable of being performed independently without teamwork or tandem work and should not require interaction with the public; she can adapt to occasional changes and work duties that are explained.

(Tr. 21, PAGEID #: 61).

In so finding, the ALJ recognized Plaintiff's impairments "could reasonably be expected to produce at least some of" her symptoms. (Tr. 22, PAGEID #: 62). However, the ALJ concluded that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). The ALJ reviewed the record concerning Plaintiff's mental impairments. (Tr. 25–26, PAGEID #: 65–66). She observed that the record reflected limited treatment for Plaintiff's mental impairments and "that the psychiatric portion of her physical exams revealed that the claimant consistently had normal findings with her mood, affect, and behavior . . . ." (*Id.*). Reviewing the opinion evidence of Drs. Meyer, Douglass, and Terry, the ALJ concluded that their opinions were entitled to significant weight with certain limited exceptions. (Tr. 27–28, PAGEID #: 67–68).

The ALJ subsequently concluded that Plaintiff could perform a number of jobs that existed in significant numbers in the national economy, including mail clerk, hand packager, and garment folder. (Tr. 30–31, PAGEID #: 70–71). Therefore, the ALJ found that Plaintiff had not been under a disability since the alleged onset date. (Tr. 31, PAGEID #: 71).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The

Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff contends that the ALJ's decision should be reversed because the ALJ assigned significant weight to the opinions of the state agency psychologists and Dr. Meyer but failed to properly account for all of the mental health limitations proposed by them. (Doc. 10 at 6–10). Specifically, Plaintiff argues that the ALJ failed to account for her need for: "a structured, stable, and predictable environment"; "only repetitive work tasks"; "intermittent contact"; and assistance and supervision as described by Dr. Meyer. (*Id.* at 7–9).

"Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs," ALJs are required "to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists." SSR 96-6P, 1996 WL 374180, at *2 (S.S.A. July 2, 1996). ALJs "are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Id.*

"Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r*, 618 F. App'x 267, 275 (6th Cir. 2015) (citing *Harris v. Comm'r of Soc. Sec. Admin.*, No. 1:13–CV–00260, 2014

WL 346287, at *11 (N.D. Ohio Jan. 30, 2014)). Ultimately, RFC assessments are an issue "reserved to the Commissioner in 20 CFR 404.1527(e) and 416.927(e)." SSR 96-6P, 1996 WL 374180, at *3 (S.S.A. July 2, 1996).

The Court finds no error in the ALJ's RFC assessment. Addressing Plaintiff's mental impairments as part of the RFC analysis, the ALJ concluded that Plaintiff:

> can perform simple routine tasks at an average pace but cannot perform jobs with strict time or production demands; she can interact occasionally with coworkers and supervisors but work tasks should be capable of being performed independently without teamwork or tandem work and should not require interaction with the public; she can adapt to occasional changes and work duties that are explained.

(Tr. 21, PAGEID #: 61). First, this assessment is consistent with Dr. Terry's finding that Plaintiff could perform work in "structured, stable, and predictable environment," (Doc. 10 at 7). The ALJ limited Plaintiff to "simple routine tasks," which are inherently structured, stable and predictable. Further, by limiting Plaintiff to jobs with no "strict time or production demands," the ALJ ensured that Plaintiff could work at a stable and predictable pace. Finally, a job with only "occasional changes" and "work duties that are explained" is another way of saying that Plaintiff needed a stable and predictable work environment.

Second, the ALJ's RFC assessment is consistent with Dr. Terry's finding that Plaintiff could only perform "repetitive work tasks" with "intermittent contact," (*id.* at 8–9). As noted above, the ALJ limited Plaintiff to "simple routine tasks" with occasional contact with coworkers and supervisors and no interaction with the public. "Routine" and "repetitive" are synonyms.[1]

---

[1] The Merriam-Webster Dictionary defines the adjective "routine" as "of a commonplace or repetitious character." Merriam-Webster Online, https://www.merriam-webster.com/dictionary/routine (last visited Nov. 19, 2018).

So too are "occasional" and "intermittent."[2] The ALJ's use of synonyms in her RFC assessment was not erroneous. *See Reeves*, 618 F. App'x at 275 ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim." (citing *Harris*, 2014 WL 346287, at *11)).

Finally, the ALJ's RFC analysis was consistent with Dr. Meyer's findings regarding the assistance and supervision Plaintiff would require. Plaintiff argues to the contrary:

> Dr. Meyer opined that Ms. Harris required both oral and hands on assistance and supervision as needed. He also opined that Ms. Harris needed assistance as needed at times of learning and performing new tasks. Finally, Dr. Meyer opined that Ms. Harris would need assistance available as needed at times of change in routine. While the ALJ did include a limitation that any changes need to be explained, that is far less restrictive than the need for assistance that is opined by Dr. Meyer. More importantly, there is no discussion by the ALJ as to why these express limitations were completely overlooked by the ALJ.

(Doc. 10 at 9 (internal citations omitted)). But in her hearing decision, the ALJ addressed a similar argument from Plaintiff's counsel at the time:

> Mr. Graham argued that consultative examiner Dr. Meyer's opinion supports a finding of disability because he stated that the claimant needs "oral and hands on assistance and supervision as needed" to complete her work. However, this statement does not mean that the claimant needs constant supervision or help to complete tasks. It just means that the claimant will at times require supervision and help to complete her job, which is true for almost any employee. I also note that the claimant was able to follow simple instructions on exam with no difficulty and did not report any history of problems in her past work. She has past skilled work, as noted below. Dr. Meyer opined that she would be able to carry out simple *and moderately complex* tasks with oral and hands on assistance as needed, and with assistance "as needed" at times of learning new tasks or changes in routine. I limited the claimant to performing simple routine tasks. This eliminates moderately complex work and also greatly limits the occasion to

---

[2] The Merriam-Webster Dictionary defines the adjective "occasional," in part, as "encountered, occurring, appearing, or taken at irregular or infrequent intervals." Merriam-Webster Online, https://www.merriam-webster.com/dictionary/occasional (last visited Nov. 19, 2018). Compare that definition with "intermittent," which is defined as "coming and going at intervals." Merriam-Webster Online, https://www.merriam-webster.com/dictionary/intermittent (last visited Nov. 19, 2018). The Merriam-Webster Dictionary explicitly identifies "occasional" and "intermittent" as synonyms. *See id.*

adapt to change or learn new tasks. I also adopted an express limit on adapting to changes. Combined, these limits adequately accommodate the claimant's mental health deficits, particularly in view of her many normal presentations and her limited treatment after her alleged onset date.

(Tr. 28, PAGEID #: 68).

The ALJ's explanation provides a logical bridge between the record and her RFC assessment. As demonstrated above, far from overlooking the limitations recommended by Dr. Meyer, the ALJ acknowledged them and incorporated them into her RFC analysis. The ALJ did not err as a result.

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision

of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date: December 4, 2018 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE